FILED

2010 Nov-30  AM 10:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| PHILIP J. LAMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:09-cv-01523-JEO |
| | ) | |
| DAIICHI SANKYO, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The plaintiff, Philip J. Lamb (hereinafter "Plaintiff"), filed the present action on July 30, 2009, asserting that he was unlawfully discharged from his employment with the defendant, Daiichi Sankyo, Inc. (hereinafter "DSI") in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000 *et seq*. ("Title VII").  The parties have consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).  (Doc. 39).  Before the court is DSI's Motion for Summary Judgment as to all claims against it, filed on March 12, 2010.  (Doc. 12).[1]  Also before the court is DSI's Motion to Strike portions of Plaintiff's evidentiary submission, filed on May 25, 2010.  (Doc. 34).  The motions have been fully briefed and are ready for disposition.  Upon consideration, the motion for summary judgment is due to be denied.  The motion to strike is due to be granted.

---

[1] References herein to "Doc.___" are to the document number assigned by the Clerk of the Court in the court file.

I.      **FACTUAL HISTORY**[2]

DSI is the United States subsidiary of Daiichi Sankyo Co., Ltd., a global pharmaceutical manufacturing and sales company based in Tokyo, Japan.  DSI was established in April 2006 from a merger between Sankyo Pharma, Inc., and Daiichi Pharmaceutical Corporation.  It is headquartered in Parsippany, New Jersey.  (Mangean Dep. Exh. 7).

Plaintiff was hired by Daiichi Pharmaceutical Corporation as a sales representative in 2000.  When that company merged with Sankyo Pharma, Inc., in April 2006, Plaintiff was offered a promotion to District Manager with the newly-established DSI.  At this time, Plaintiff received copies of DSI's corporate policies proscribing workplace harassment, unlawful discrimination and retaliation, and DSI's policy regarding employee conflicts of interest.  Plaintiff also underwent mandatory training on compliance with these policies.  At all times relevant to this action, Plaintiff worked in the same position as a district manager for DSI in Birmingham, Alabama.  (*Id*.).

Plaintiff worked with two counterparts in his capacity as a district manager.  Rick Leventry was District Manager for sales representatives in Primary Care District 1 (hereinafter "PC1"), Plaintiff was District Manager for sales representatives in Primary Care District 2 (hereinafter "PC2"), and Catherine Newman was District Manager for sales representatives in Primary Care District 3 (hereinafter "PC3").  (Mangean Dep. Exhs. 23, 24).  All sales representatives in each primary care district worked in the same geographic area of northeastern

---

[2]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F. 3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Facts are undisputed unless otherwise noted.  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  *See Fitzpatrick v. City of Atlanta*, 2 F. 2d 1112, 1115 (11th Cir. 1993).

Alabama and reported to either Plaintiff, Rick Leventry, or Catherine Newman.  (Holmes Dep. at 69).  Plaintiff supervised approximately ten (10) sales representatives within his primary care district.  (*Id*.)  Among those representatives were Amy Holmes, Christy Mascolo-Brown, Ross Williams, Leigh Little, and Melissa Sites.  (*Id*. at 9; Pl. Dep. Exh. 15; Holmes Dep. at 12; Pl. Dep. at 51).

During his first year as a district manager, Plaintiff was supervised by Regional Director Ken Ring.  The record does not suggest that Plaintiff experienced any significant problems under Ring's supervision, and his performance evaluation for fiscal year 2006 gave him an overall rating of "Exceeds Expectations."[3]  He was rated "highly proficient" or "competent" in 71 out of 81 specific areas of performance.  Areas designated as "needing improvement" were (1) timely communication and clear feedback to sales representatives, (2) greater consistency in holding sales representatives accountable for sales figures, (3) business planning and execution, which included "accurately assess[ing] length and difficulty of tasks and projects," and (4) various administrative tasks, such as reviewing expense reports.  At no time during his first seven years of employment with DSI, or Daiichi Pharmaceutical Corporation, does the record suggest that Plaintiff engaged in, or was accused of, inappropriate behavior toward any DSI employee. (Mangean Dep. Exh. 10).

Approximately sixteen months prior to his termination, Plaintiff came under the supervision of Kerri Colvin (hereinafter "Ms. Colvin"), a female regional director with DSI.  (Pl.

---

[3]  In the evaluation, "Exceeds Expectations" is defined as "[e]mployees who maintain a high level of performance during the appraisal period and perform at a level which equals, and often times exceeds that which is expected.  They consistently complete work objectives, reliably meet and exceed performance standards, often display initiative and generally contribute to the team's success.  They clearly perform in accordance with the company's values."  (Mangean Dep. Exh. 10 at 1).

Dep. at 93).  It is not clear how closely Plaintiff worked with Ms. Colvin in the daily

performance of his job.  According to Plaintiff, however, Ms. Colvin made remarks on several

occasions that suggested she held a discriminatory animus toward men.  For example, in April

2007, Ms. Colvin stated to a meeting of district managers, including Plaintiff, that she "wanted

more women in leadership positions" at DSI, and that she was "looking forward to hiring a bunch

of new people, get some more estrogen in" the office, because she felt "[t]here [were] not enough

women district managers" at DSI.  (*Id*. at 232, 298).  Ms. Colvin also announced that Natasha

Nelson, Director of Compliance for DSI (hereinafter "Ms. Nelson"), had expressed similar

concerns during a women's forum at DSI.  Specifically, Ms. Nelson stated that "she wanted more

women in leadership positions and that DSI had too many men in top leadership positions."[4]  (*Id*.

at 231-32).  When Plaintiff questioned Ms. Colvin how she intended to add more women to her

team, she responded that she would hire more women during a planned expansion of the district.

(*Id*. at 299).  According to Plaintiff, Ms. Colvin did hire more women, but the record does not

provide the number of women hired, their identities, or any indication when these hirings took

place.  (*Id*. at 300).

In September 2007, Ms. Colvin stated that it was "good to [have] some new women on

our team.  We have to make sure we have a strong presence of women on our management

team."  (*Id*. at 299).  Witnesses to this comment and to Ms. Colvin's comments in April 2007

included several district managers who reported to her, including Plaintiff, Victor Gutierrez,

Cleve Hale, Chris Paul, and John Hill.  (*Id*. at 298-99).  Finally, in January 2008, while under the

---

[4]  The record does not inform the court of the date or approximate date or location of the forum where Ms.
Nelson allegedly made this remark.

influence of alcohol, Ms. Colvin allegedly commented to several district managers at an out-of-town meeting that "I had a bad relationship when I [was] abused and I will never let a man control me again." (*Id*. at 300-01). Plaintiff was not present when this comment was made, but learned of it from another district manager. (*Id*.)

On January 31, 2008, Plaintiff counseled Christy Mascolo-Brown, a sales representative who reported to him, with concerns about her job performance. The conference took place over the telephone, wherein Plaintiff informed Ms. Brown that "she was not meeting expectations." (*Id*. at 50-52). Later that day, Leigh Little, another sales representative who reported to Plaintiff, told Plaintiff that Ms. Brown had complained to her about him, stating "if I (Ms. Brown) go down, he is going down." (*Id*. at 50). Three months later, Ms. Brown filed a complaint with DSI's Human Resources Department in which she alleged that Plaintiff had harassed her by making inappropriate comments about his ex-wife, and by demanding that Ms. Brown "fix him up" with dates with her friends. (Mangean Dep. Exhs. 16, 39).

On February 25, 2008, Ms. Colvin drafted a memorandum to Plaintiff, which she copied to Lori Huff, a regional business manager for DSI, and to Brian Hauser, supervisor to both Ms. Colvin and Ms. Huff. The memorandum began with the following statement: "This document will summarize several coaching topics that either Lori or I have addressed with you over the past few months. These were either delivered via email or discussed in person." The memorandum continued with several areas wherein Ms. Colvin felt Plaintiff could improve his job performance. They included (1) sending weekly voice mails to his sales representatives, (2) shortening and clarifying lengthy email directives to his sales representatives, and (3) holding sales representatives accountable when they exhibited a "lack of growth" for four consecutive

weeks.  (Pl. Dep. Exh. 8).  Ms. Colvin further admonished Plaintiff for rearranging the agenda

for a plan of action meeting without prior authorization.  She also warned Plaintiff that his failure

to properly emphasize DSI's preestablished directives for his sales representatives had caused a

decline in his team's overall performance from the previous quarter.  Finally, Ms. Colvin offered

several specific instructions that she believed would aid Plaintiff in managing his team,

instructions which Plaintiff felt were unnecessary and unfairly targeted at him to the exclusion of

all other district managers.[5]  (*Id.*; Pl. Dep. at 140).

Although he attempted to comply with Ms. Colvin's directives, Plaintiff also complained

to Lori Huff that he felt "singled out" by Ms. Colvin, and that she was supervising him too

closely by requiring him to perform unnecessary tasks.  Ms. Huff advised him to "just do what

[Ms. Colvin] asks and it will blow over."  Plaintiff also contacted Audrey McSherry, Manager of

Sales in the Human Resources Department.  The record does not indicate whether and to what

extent Ms. McSherry assisted Plaintiff.  (*Id*. at 140-43).

Approximately three weeks later, Plaintiff attended an informal lunch at a Mexican

restaurant with Ross Williams and Melissa Sites, two sales representatives who reported to him,

and Maria Soldevilla, a sales representative who reported to Catherine Newman, another district

manager.  During the lunch, Plaintiff allegedly began "joking around" with Mr. Williams about

various items on the menu.  One item that drew their attention was a "big meat burrito with

Chihuahua cheese."  Ms. Soldevilla felt the discussion was culturally insensitive, and informed

Plaintiff that her family originated in Chihuahua, Mexico.  She also explained that Chihuahua

---

[5]  Other district managers who reported to Ms. Colvin at or around this same included Victor Gutierrez,
LeeAnn Solt, Michelle (last name unknown), John Hill, Cleve Hale, Chris Paul, and Shane Shove.  (Pl. Dep. at 155-
59).

cheese was produced by German Mennonite colonies in Chihuahua.  According to Ms.

Soldevilla, Plaintiff responded by saying "I wonder if Chihuahua cheese comes from milking tiny

Chihuahua dogs' tits."  (Soldevilla Dep. at 26).

Ms. Soldevilla testified that she was deeply upset by the comment, but did not report it

because she feared that doing so would have a harmful impact on Plaintiff's job with DSI.  (*Id*. at

27-28).  She also testified that the comment was so repulsive to her that she did not care to repeat

it to anyone, even her district manager, Ms. Newman, or anyone in the Human Resources

Department at DSI.  (*Id*. at 28).

On April 8, 2008, Ms. Soldevilla was scheduled to host a lunch at the office of a

physician who was a client or prospective client of DSI.  DSI policy required that sales

representatives attend all lunch meetings hosted by DSI to introduce new products and services

from the company.  (*Id*. at 45-47).  Ms. Soldevilla was unexpectedly called to attend a family

matter before the lunch was scheduled to occur.  She asked Ross Williams to cover the lunch for

her until she returned.  (*Id*. at 49-51).  She did not return until after the lunch had ended, and

learned that Plaintiff had reported her absence from the lunch to her manager, Catherine

Newman.  (*Id*. at 57).  Ms. Soldevilla testified that she thought it was "very unprofessional" of

Plaintiff to report her absence to Ms. Newman and, two weeks later, she told Ms. Newman about

Plaintiff's comment at the Mexican restaurant the previous month.  (*Id*. at 58-60).  She did not

disclose any details about the comment, stating only that the comment had made her

"uncomfortable."  (Newman Dep. at 15, 21).  She begged Ms. Newman not to report the incident

to anyone else in the company, but Ms. Newman explained that it was her duty as a district

manager to communicate it to Human Resources.  Ms. Newman then contacted Audrey

McSherry to report that Plaintiff had made comments that made Ms. Soldevilla uncomfortable. (*Id.* at 23).

Within approximately a week or two, on April 25, Plaintiff received his first performance evaluation from Ms. Colvin.  (Pl. Dep. Exh. 5).  His overall rating appears to have been "Meets Expectations."[6]  (*Id.*)  He was rated "highly proficient" or "competent" in 63 of 81 specific areas of performance.  Ms. Colvin indicated that Plaintiff "needed development" in the remaining 18 areas, including leadership, team management, initiative, and business planning and execution. Ms. Colvin commented that "there are substantial differences in [Plaintiff's] self evaluation versus the perception of others, specifically peers and managers....  There are examples throughout FY2007 where [Plaintiff's] judgment was questioned[.]"  (*Id.*)  Ms. Colvin also expressed concern that Plaintiff had violated company policy by interviewing and hiring his personal friend, Ross Williams, as a sales representative for his team, and assigning to Mr. Williams a territory in East Birmingham which he had already promised to Amy Holmes, another sales representative who reported to Plaintiff.  (*Id.*)  Ms. Colvin believed Plaintiff had interviewed Mr. Williams by himself, though two district managers were required to attend all interviews of prospective sales representatives.  Ms. Colvin admonished Plaintiff for failing to

---

[6]  The court cannot discern with clarity whether Plaintiff's overall rating was "Meets Expectations" or something else, as the document on which the review was given is not completely clear.  The document states as follows:

**I. Overall Performance Rating**

Meets Expectations

(Pl. Dep. Exh. 5 at 1).  This section is then followed by definitions of all possible "Overall Performance Ratings," including "Outstanding," "Exceeds Expectations," "Valued," "Improvement Needed," "Does Not Meet Expectations," and "Too New To Rate."  No definition for "Meets Expectations" is provided.  (*Id.*)  Craig Mangean, DSI's Rule 30(b)(6) corporate representative witness, conceded that Plaintiff apparently received an Overall Performance Rating of "Meets Expectations" from Ms. Colvin.  (Mangean Dep. at 54).

8

inform anyone at DSI that Mr. Williams was his friend before hiring him.  (*Id*.)  She informed

Plaintiff that the Human Resources Department was investigating his decision to hire Ross

Williams, in addition to allegations by a female sales representative, later revealed as Christy

Mascolo-Brown, that Plaintiff had harassed her.  (Pl. Dep. at 60).

Finally, Ms. Colvin noted that the Birmingham district had fallen during fiscal year 2007

from tenth place overall to sixteenth place.  She explained that Plaintiff

> has not demonstrated that he has undertaken additional responsibilities within his District
> HUB or the region management team....  To be considered for future promotional
> opportunities, [Plaintiff] will need to establish himself as a respected leader within the
> [Southeast] region.  Improved performance, increased sharing of best practices, and
> exemplary P & O will enhance the way he is perceived among his peers and management.

(Pl. Dep. Exh. 5).

On or about April 28, 2008, Plaintiff sent an email to Ms. Colvin and Brian Hauser

stating his intent to withdraw his signature from his performance evaluation and requesting to

meet with both managers regarding his concerns about his review.  (Pl. Dep. at 98).  It is not

clear what response Plaintiff received, but he testified that he did not speak to Mr. Hauser again

after sending the email.  (*Id*. at 102).

On May 1, 2008, a team of investigators comprised of Ms. Colvin, Audrey McSherry,

Natasha Nelson, and Pat Barbieri, an attorney from DSI's legal department, met with Ms.

Soldevilla regarding Plaintiff's comment about Chihuahua cheese.  (Mangean Dep. Exh. 19).

Ms. Soldevilla did not relate any details of the comment itself, but explained that it made her

uncomfortable enough to report it to Ms. Newman.  (*Id*.)  She stated only that she felt the

comment was unprofessional, but did not communicate the potentially sexual nature of the

comment.  When asked if she had "ever felt violated or observed [a] violation of EEOC" policies

9

by Plaintiff, she answered that she had not.  (*Id.*; Soldevilla Dep. at 28).

The investigators then questioned Ms. Newman, who stated that another sales representative, Leigh Little, had complained to her several months before that Plaintiff had made her uncomfortable by discussing details about his divorce.  Ms. Little had complained to Ms. Newman that Plaintiff asked her to obtain information about his wife, who he believed had been unfaithful during their marriage.  Ms. Newman did not report Ms. Little's concern until several months later because she "didn't want to get [Plaintiff] in trouble."  (Newman Dep. at 31-32).  Ms. Little was no longer employed by DSI at the time of the investigation and was not interviewed.  (Pl. Dep. at 51).

Ms. Newman also told the investigators that a rumor had circulated through her office that Plaintiff had told his team to "keep their mouths shut" and not report any complaints they had to anyone in upper management at DSI.  (Mangean Dep. Exh. 23).  According to Ms. Newman, some of Plaintiff's team members were afraid to complain about him because they feared that, as their supervisor, he might retaliate against them.  (*Id.*)  Finally, Ms. Newman expressed concern over the friendship between Plaintiff and Ross Williams, stating that neither she nor Rick Leventry had interviewed Mr. Williams with Plaintiff before Plaintiff hired him. (*Id.*)

Rick Leventry confirmed that he had not interviewed Mr. Williams but was unsure whether Ms. Newman had.  (Mangean Dep. Exh. 24).  He concurred with Ms. Newman that Plaintiff's friendship with Mr. Williams created a conflict of interest for Plaintiff, and that he had also heard a rumor that Plaintiff tried to obtain information about his wife from Leigh Little.  He expressed discomfort working with Plaintiff because he believed Plaintiff was "intellectually

10

vindictive," had exercised questionable judgment on at least one occasion, and that Ms. Newman was afraid Plaintiff would "bring others down with him." Mr. Leventry feared that Plaintiff's team was withholding complaints about Plaintiff to avoid potential retaliation. He described Plaintiff as a "constant distraction," but gave no specific information about this claim. He believed Plaintiff possessed poor judgment when he hired Christy Mascolo-Brown after he was told by another district manager that Ms. Brown was "a problem." (*Id.*)

The investigators next interviewed Amy Holmes, a sales representative who reported to Plaintiff. Ms. Holmes stated that Plaintiff had shared inappropriate details with her about his wife during their divorce, but that he had stopped discussing the matter after she told him she was uncomfortable with the subject. She never reported his conduct to Human Resources. She stated that Plaintiff had used profanity infrequently during conversations with her, and stopped altogether when she asked him to. She stated she had not witnessed any EEOC violations by Plaintiff, but that Christy Mascolo-Brown had complained to her that Plaintiff made her uncomfortable on several occasions. Ms. Holmes had not witnessed any such behavior herself, and was unsure whether to believe Ms. Brown. In deposition, Ms. Holmes stated eleven times that she did not report to DSI that Plaintiff had engaged in inappropriate behavior. (Holmes Dep. at 16, 30, 37, 38, 39, 40, 42, 44, 48, 74). However, Christy Mascolo-Brown told the investigators that Ms. Holmes had, in fact, reported Plaintiff. (Mangean Dep. Exh. 21).

When Plaintiff hired Ross Williams, he assigned him to a territory of Birmingham that he had already promised to Ms. Holmes. Ms. Brown told to the investigators that Plaintiff had deliberately assigned the territory to Mr. Williams instead of Ms. Holmes in retaliation for Ms. Holmes' reporting him. (Mangean Dep. Exh. 21). However, again, Ms. Holmes testified that

11

she did not report any inappropriate behavior by Plaintiff to DSI, and stated to the investigators

that she did not believe Plaintiff's decision to assign the territory to Mr. Williams was retaliatory.

(Holmes Dep. at 16, 30, 37, 38, 39, 40, 42, 44, 48, 74; Mangean Dep. Exh. 28 ("Amy thinks the

territory change was not retaliation.").  Nevertheless, for reasons unknown to the court, Kerri

Colvin appears to have given more weight to Ms. Brown's account than Ms. Holmes', and stated

to Pat Barbieri, Audrey McSherry, and Brian Hauser that Amy "commented that she felt

'punished for something she didn't even do (report [Plaintiff])."" (Mangean Dep. Exh. 36).  The

record contains no other evidence to suggest that Ms. Holmes actually made this statement.  No

such statement is recorded in the notes from Ms. Holmes' interview, when she allegedly made

the comment.

     During her interview, Christy Mascolo-Brown made the following allegations against

Plaintiff:

      1.     In July 2006, during an out-of-town meeting with his team, Plaintiff called

           Ms. Brown at her hotel room to invite her to "come gamble" with him

           (Mangean Dep. Exh. 39);

      2.     In November 2006, Plaintiff attended a meeting in Tampa, Florida with

           the sales representatives on his team.  A sales representative named Louise

           Hester asked if she could take a cigarette break.  Plaintiff allegedly

           responded, "Come on Weezer I know you want to go up and use your

           vibrator."  (Mangean Dep. Exh. 21);

      3.     Plaintiff "cussed constantly – on field rides, in meetings in front of [the]

           group."  (Mangean Dep. Exh. 39);

4.     Plaintiff "used [a] marijuana analogy for one of [DSI's] products and would repeat it to doctors."  (*Id*.)

5.     Plaintiff "was hung over and admitted it at meetings."  (*Id*.)

6.     Plaintiff "encouraged everyone to drink always."  (*Id*.)

7.     Plaintiff "went through a divorce and was very graphic about his ex-wife," telling her they "used to have sex in the car," that he "explicitly described their sex life and her affair with another man," including that "first she told him that it was a date rape, then he said he never believed her and that she fucked him."  On August 1, 2007, Plaintiff allegedly told Ms. Brown that his wife had gone to a job interview and "came home and said she had been raped [but] he knew that she had 'fucked' him."  (*Id*.)

8.     Plaintiff "told [Ms. Brown] that another representative reported him for being to [sic] graphic and he then got a call from his boss.  He told [Ms. Brown] while standing in a sample closet that [the representative] would regret telling on him and he would not give her the territory she wanted.  He then gave it to someone else."  (*Id*.)

9.     Plaintiff told Ms. Brown that "nobody fucked with him."  (*Id*.)

10.    Plaintiff told Ms. Brown that "he followed his wife while [they were] seperated [sic] and had a [private investigator] – he truly painted himself as a 'mad man.'"  (*Id*.)

11.    Plaintiff asked Ms. Brown why she had not "fixed him up" with a friend of hers who lived in another state.  When Ms. Brown informed Plaintiff that

13

her friend was dating someone else, Plaintiff stated that "he didn't want to date her – he wanted to 'poke her' and leave." This conversation allegedly occurred in front of another DSI employee, Chad West. (*Id.*)

12. Plaintiff "called [Ms. Brown] and texted [her] repeatedly about fixing him up with someone." Ms. Brown attempted to assuage Plaintiff by connecting him with a friend. Plaintiff, however, "repeatedly bugg[ed Ms. Brown]" to give him her friend's telephone number. Plaintiff also "repeatedly" asked Ms. Brown what she had told her friend about him, and asked Ms. Brown to tell her friend that he "had a small dick but that he could make up for it." (*Id.*)

13. Plaintiff "continuously" argued with his wife on the telephone in front of Ms. Brown, using profanity and making Ms. Brown "very uncomfortable." (*Id.*)

14. Plaintiff yelled at Ms. Brown and cursed at her during a telephone conversation about her job performance. (*Id.*)

15. Plaintiff told "four Birmingham girls" who worked for DSI "not to ever tell on him and let him hear [about it] from his boss without coming to him first." (*Id.*)

Ms. Brown also informed the investigators that Plaintiff had yelled at her at an out-of-town meeting when she removed documents from the premises without his permission. She explained that she was "truly scared of [Plaintiff] and pray[ed] he does nothing to retaliate and [sic] he did both to his wife and the other reps." (*Id.* at 7).

14

Finally, the investigators interviewed Melissa Sites, a sales representative who also reported to Plaintiff.  (Mangean Dep. Exh. 26).  Ms. Sites and her husband were personal friends of Plaintiff and his ex-wife.  Ms. Sites had worked with Plaintiff for six years, but had not witnessed any inappropriate behavior by Plaintiff, and did not recall Plaintiff making any comment about Chihuahua cheese to Ms. Soldevilla, or making any jokes regarding national heritage.  Ms. Sites did not recall Plaintiff using profanity or making comments with a sexual reference to his coworkers.  She had discussed Plaintiff's divorce with him, but "not during working time," and told the investigators that Plaintiff had "never" engaged in inappropriate discussions about his divorce, nor had he ever used profanity when discussing his former wife. (*Id*.)  Following Ms. Sites's interview, the investigators "all felt her answers somewhat obstructed the investigation because for most of the questions she responded 'not that I can recall, no.'" (Pl. Dep. Exh. 16).  No explanation is given why Ms. Sites's failure to remember the details inquired of her was considered an obstruction and not a genuine failure to recall events.

On May 2, 2008, Plaintiff was interviewed for approximately ninety minutes.  (Pl. Dep. at 13).  He had not been informed what questions he would be asked prior to the interview, and was not given an opportunity to gather evidence to support his answers after the interview concluded. (*Id*. at 193).  He admitted he might have used profanity when discussing his divorce with his coworkers, but denied the majority of the claims asserted against him.  (Mangean Dep. Exh. 30). When the interview concluded, Ms. Colvin informed him that he was being terminated for violating DSI's policy against workplace harassment.  (Pl. Dep. at 13).  It is not clear to what degree Plaintiff's termination was also for interviewing Ross Williams without another district manager present.  Ms. Colvin, however, reported to Pat Barbier, Audrey McSherry and Brian

15

Hauser that Plaintiff had not followed the "expansion policy for DM-partner reviewing" in his territory.  (Mangean Dep. Exh. 36).

A short time later, Natasha Nelson was terminated for making threats against DSI employees and for pursuing compliance investigations against them in an "overly aggressive" manner.  (Mangean Dep. at 13-14).  Ms. Colvin voluntarily resigned her position with DSI shortly after Plaintiff and Ms. Nelson were terminated.  (*Id*. at 126-27).  The reason for her resignation is not clear.  DSI's corporate representative, Craig Mangean, testified that Ms. Colvin was not pressured to leave the company, but she did leave DSI with "some concerns about her leadership[.]" (*Id*. at 128).  He was not asked to elaborate on the nature of or bases for these concerns.  At the time of this action, Plaintiff was employed as a district manager with Publicis Selling Solutions, where he supervises fifteen employees in the pharmaceutical industry.  (Pl. Dep. at 8-9).

## II.    PROCEDURAL HISTORY

Plaintiff filed a discrimination charge with the EEOC against DSI on July 31, 2008.  (Pl. Dep. Exh. 1).  In it, he alleged that he was unlawfully terminated from DSI on the basis of his gender.  He received his Right to Sue letter on or about May 4, 2009, and filed his Complaint in this action on July 30, 2009.  (*Id*.)

In his Complaint, Plaintiff asserts claims of gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000 *et seq*. ("Title VII") (Count I), negligence (Count II), and intentional interference with business relations (Count III).  DSI filed the pending Motion for Summary Judgment as to all of these claims on March 12, 2010, to which Plaintiff responded in opposition on May 11, 2010.  (Docs.

16

12, 31, respectively).  In his opposition brief, Plaintiff stated that he "voluntarily dismisses" his claims of negligence and intentional interference with a business relationship against DSI.  (Doc. 31 at 14, fn. 1).  DSI filed its reply on May 25, 2010.  (Doc. 35).  Also on May 25, DSI filed a Motion to Strike portions of Plaintiff's evidentiary submission, which Plaintiff opposes.  (Doc. 34).

## III.    STANDARD OF REVIEW

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F. 3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was based on intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F. 2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), *as modified by Desert Palace v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003), that allocation scheme applies only in cases where there is no

direct evidence of discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F. 2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must either prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination or present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas Corp.*, 411 U.S. at 802-05, 93 S. Ct. at 1824-27; *Burdine*, 450 U.S. at 252-54, 101 S. Ct. at 1093-95; *Desert Palace*, 539 U.S. at 101-02, 123 S. Ct. at 2155-56.

## IV.   ANALYSIS

### A.   Motion for Summary Judgment

At the outset, the parties appear to dispute the elements which form Plaintiff's *prima facie* case of gender discrimination. According to DSI, Plaintiff must demonstrate that "he was suspended or fired while others not in the plaintiff's protected class, 'having comparable or lesser qualifications,' were retained." *Whiting v. Jackson State University*, 616 F. 2d 116, 121 (5th Cir. 1980). DSI does not appear to dispute any of these elements, but maintains that its motion for summary judgment should be granted because Plaintiff has failed to demonstrate that a similarly situated employee outside his protected class was treated more leniently for engaging in "nearly

18

identical" misconduct as Plaintiff.  *See Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999)

(affirming summary judgment for employer where plaintiff failed to establish that similarly

situated male employees engaged in the same or similar misconduct as plaintiff without being

terminated).

DSI correctly points out that the record lacks evidence that any DSI employee outside

Plaintiff's class engaged in similar misconduct, i.e., violating the company's policy against

workplace harassment, without being terminated.  However, Plaintiff argues that a *prima facie*

case of wrongful termination may be established upon the following elements: (1) Plaintiff

belongs to a protected category, (2) he was qualified to perform his job, (3) his employment was

terminated, and (4) he was replaced by an individual outside his protected class.  *Cuddeback v.*

*Florida Bd. of Educ.*, 381 F. 3d 1230, 1236 (11th Cir. 2004).

The primary difference between the parties' proffered analytical frameworks is that DSI

urges the court to apply the "similarly situated employee" element to Plaintiff's *prima facie* case,

and Plaintiff does not.  In fact, Plaintiff does not even address whether this element can be

satisfied with the evidence now before the court, but ignores that element altogether.  However,

although it is DSI's burden on summary judgment to demonstrate, as a matter of law, that it is

entitled to judgment based on the evidence of record, DSI offers no explanation for why its

chosen framework should apply to Plaintiff's claim and not that espoused by Plaintiff.  DSI was

given the opportunity to rebut Plaintiff's argument that *Cuddeback* should control here, but

instead focused its entire reply brief on disputing Plaintiff's proffered undisputed facts.  (See

Doc. 35).

Without the aid of briefing relevant to this issue, the court turns to the pertinent case law

19

for clarification as to the appropriate standard for determining whether Plaintiff has presented a

*prima facie* case.  The Eleventh Circuit recognizes that "[t]he *prima facie* case method ... was

never intended to be rigid, mechanistic, or ritualistic."  *Nix v. WLCY Radio/Rahall*

*Communications*, 738 F. 2d 1181, 1185 (11th Cir. 1984), quoting *U.S. Postal Service Bd. of*

*Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983), and

*Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 2949, 57 L. Ed. 2d 957 (1978)

(internal quotations omitted).  *See also Wilson v. B/E Aerospace, Inc.*, 376 F. 3d 1079, 1087

(11th Cir. 2004) ("The methods of presenting a *prima facie* case are not fixed; they are flexible

and depend to a large degree upon the employment situation.").  The court has instructed further

that

> A *prima facie* case of discriminatory discharge may be established in different
> ways.  One way is [to show that] a member of a protected class ... was qualified
> for the job, but was fired and replaced by one outside the protected class.  *Krieg v.*
> *Paul Revere Life Ins. Co.*, 11 Cir. 1983, 718 F.2d 998, 999 (*per curiam*), *cert.*
> *denied*, 1984, 466 U.S. 929, 104 S. Ct. 1712, 80 L. Ed. 2d 185 (1984); *Lincoln* [*v.*
> *Bd. of Regents of Univ. Sys. of Ga.*], 697 F.2d [928,] 937; *Marks v. Prattco*, 5
> Cir.1979, 607 F.2d 1153, 1155.  But we have also held that a plaintiff establishes
> a *prima facie* case by showing that he was suspended or fired while others not in
> the plaintiff's protected class, "having comparable or lesser qualifications," were
> retained.  *Whiting v. Jackson State University*, 5 Cir. 1980, 616 F.2d 116, 121.
>
> ... [A] third version of the *prima facie* case [is] based on differential application of work
> or disciplinary rules.  In *McDonald v. Santa Fe Trail Transportation Co.*, 1976, 427 U.S.
> 273, 96 S. Ct. 2574, 49 L. Ed. 2d 493, the Court held that an employer would violate Title
> VII if it fired black employees who participated in a theft of cargo while retaining whites
> guilty of the same offense.  *Id*., 427 U.S. at 282-84, 96 S. Ct. at 2579-80.  We have
> consistently held that a plaintiff fired for misconduct makes out a *prima facie* case of
> discriminatory discharge if he shows that he is a member of a protected class, that he was
> qualified for the job from which he was fired, and "that the misconduct for which [he]
> was discharged was nearly identical to that engaged in by [an employee outside the
> protected class] whom [the employer] retained."  *Davin v. Delta Air Lines, Inc.*, 5 Cir.
> Unit B 1982, 678 F.2d 567, 570; *accord Rohde v. K.O. Steel Castings, Inc.*, 5 Cir. 1981,
> 649 F.2d 317, 322-23; *Brown v. A.J. Gerrard Mfg. Co.*, 5 Cir.1981, 643 F.2d 273, 276;

> *Green v. Armstrong Rubber Co.*, 5 Cir. 1980, 612 F.2d 967, 968 (*per curiam*), *cert. denied*, 1980, 449 U.S. 879, 101 S. Ct. 227, 66 L. Ed. 2d 102; *Turner v. Texas Instruments, Inc.*, 5 Cir. 1977, 555 F.2d 1251, 1255; *see also Anderson v. Savage Laboratories*, 11 Cir. 1982, 675 F.2d 1221, 1224.

*Nix*, 738 F.2d at 1185. *See also Mathis v. Leggett & Platt*, 263 Fed. Appx. 9, 2, n. 3 (11th Cir. 2008) (recognizing that, in addition to the "similarly situated employee" element, "[t]here are other ways to establish a *prima facie* case of discrimination, but [the plaintiff] has chosen to proceed under the 'similarly situated' comparators *prima facie* analysis. *See Hawkins*, 883 F.2d at 982, 984-85 (discussing alternate methods of establishing a *prima facie* case, including the "similarly situated" analysis, use of statistical proof of a pattern of discrimination, and by demonstrating that the plaintiff was fired and was replaced by a person outside of his protected class).").

While more than one analytical framework applies to Title VII cases in general, the Eleventh Circuit in *Nix* and *Mathis* failed to distinguish which framework applies to which set of circumstances, and appears to have left that question open for each district court to examine on a case by case basis. *See Moore v. State of Ala.*, 989 F. Supp. 1412, 1417 (M.D. Ala. 1997) ("There is no one correct formulation of what a Title VII plaintiff must prove to establish a *prima facie* case. The elements of a *prima facie* case must be adapted to fit the variety of contexts from which a claim of discrimination may arise"), citing *McDonnell Douglas*, 411 U.S. at 802 n. 13; *Aikens*, 460 U.S. at 715 (1983), *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)); *Nix*, 738 F. 2d at 1185. Accordingly, this court finds no mandate in the case law of this circuit for adapting the elements of Plaintiff's *prima facie* case to fit the context presented here. *See Hanford v. Geo Group, Inc.*, 345 Fed. Appx. 399, 405 n. 7 (11th Cir.

21

2009) (acknowledging differences between *prima facie* standards applied in the Eleventh Circuit, explaining that "[b]ecause we resolve this case on pretext, we are not required to consider ... whether our recitations of the *McDonnell Douglas* test require clarification."); *Smith v. Alltel Communications, Inc.*, 2009 WL 4067799, *7 (M.D. Ala. Nov. 23, 2009) (same).  Both *Cuddeback*, cited by Plaintiff, and *Maniccia*, cited by DSI, are panel decisions which continue to operate as binding precedent in this circuit.  While *Maniccia* was decided five years prior to *Cuddeback*, the Eleventh Circuit in *Cuddeback* took care to cite to *Nix* to support the standard espoused in *Cuddeback*, and made no reference to *Maniccia*.

Given this background, the court here acknowledges that employment discrimination may exist even in cases where a plaintiff has not or cannot satisfy the "similarly situated employee" element of the *Maniccia* standard.  *See Cuddeback*, 381 F. 3d at 1236; *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Krieg*, 718 F. 2d at 999; *Marks*, 607 F. 2d at 1155; *Whiting*, 616 F. 2d at 121; *Shoenfeld v. Babbit*, 168 F. 3d 1257, 1268 (11th Cir. 1999).  On summary judgment, where the applicable law is not explicitly clear, the court is inclined to apply Eleventh Circuit precedent in favor of the nonmovant's argument, and finds that the standard articulated in *Cuddeback* is applicable here.

As stated, the *Cuddeback* standard requires Plaintiff to demonstrate that (1) he belongs to a protected class, (2) he was qualified to perform his job, (3) his employment was terminated, and (4) he was replaced by an individual outside his protected class.  381 F. 3d at 1236, citing *Nix*, 738 F. 2d at 1185.  DSI does not dispute any of these elements, and the court finds sufficient evidence to conclude that they are satisfied.  Specifically, "Title VII's prohibition of discrimination 'because of ... sex' protects men as well as women," *Oncale v. Sundowner*

*Offshore Services, Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001 (1998), citing *Newport News*

*Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, 103 S. Ct. 2622, 2630, 77 L. Ed. 2d

89 (1983).  Plaintiff's performance evaluations indicate that he was qualified to perform his job,

despite Ms. Colvin's identifying certain areas where she thought improvement was needed.

Plaintiff's employment with DSI was terminated on May 2, 2008, and he was replaced by Kim

Mitchell, a female.  (Pl. Dep. at 32).

DSI argues, however, that Plaintiff was terminated not because of his gender, but because

he violated its policy prohibiting workplace harassment.  The evidence cited *supra* details a vast

array of claims which were brought against Plaintiff by Christy Mascolo-Brown, as well as

claims by Catherine Newman and Rick Leventry that they had heard rumors of additional

inappropriate behavior by Plaintiff.  Nonetheless, Plaintiff maintains that DSI's proffered reason

was a pretext for what actually motivated it to terminate him.  He argues that the investigation

into his alleged misconduct was conducted poorly by Ms. Colvin who, along with Natasha

Nelson, specifically intended to staff more women in leadership positions at DSI.  He also points

out that shortly after he was terminated, both Ms. Colvin and Ms. Nelson left DSI either

involuntarily, in Ms. Nelson's case, or voluntarily but with her "leadership in question," in Ms.

Colvin's case.  According to Plaintiff, these facts are sufficient to place DSI's "legitimate,

nondiscriminatory reason" for terminating him in doubt.

DSI argues that it is not for Plaintiff, or the court, to question the wisdom of its decision

to terminate him.  It points out that an employer may terminate an employee for a good reason, a

bad reason, or no reason at all, as long as the reason is not discriminatory.  *Nix*, 738 F. 2d at

1178.  As long as the decisionmakers believed Plaintiff was guilty of harassment and DSI

23

terminated him based on that honest belief, it matters not that the complaining employees might

have been "lying through their teeth." *Elrod*, 939 F. 2d at 1470.

Plaintiff may establish that DSI's proferred reason was a pretext for gender discrimination

by demonstrating that the same is "unworthy of credence." *See id.*; *Reeves v. Sanderson*

*Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 2108, 147 L. Ed. 2d 105 (2000).

The evidence before the court on the issue of pretext can be summarized as follows: First, in

April 2008, Maria Soldevilla reported to Catherine Newman that Plaintiff had made a comment

the previous month that made her "uncomfortable."  Ms. Newman reported the comment because

she felt obligated to as a district manager.  Second, also around this time, Plaintiff attempted to

counsel Christy Mascolo-Brown with concerns he had about her job performance.  Rick Leventry

sat in on the conversation, and told the investigators that Plaintiff "handled it without emotion

and with very clear expectations."  (Mangean Dep. Exh. 24).  However, Ms. Brown,

approximately two months later, filed a complaint with Human Resources that Plaintiff had

"yelled, screamed and cussed" at her during the conversation, and had harassed her beginning as

early as 2006.  (Pl. Dep. at 213).  Third, for reasons unknown to the court, Ms. Colvin decided

around this time to investigate whether Plaintiff had violated DSI's hiring policy approximately

six months before by interviewing Ross Williams without a second district manager present.  All

of these allegations against Plaintiff culminated into an investigation that resulted in several DSI

employees being interviewed, including Maria Soldevilla, Catherine Newman, Christy Mascolo-

Brown, Melissa Sites, Rick Leventry, Amy Holmes, and Plaintiff.

Ms. Soldevilla testified that at no point until her deposition, two years after Plaintiff was

terminated, did she reveal the full content of Plaintiff's comment.  She reported to the

investigators only that she felt the comment was culturally insensitive, but stated nothing about

the sexual connotation of the comment.  However, Ms. Soldevilla waited to report the comment

until after she felt that Plaintiff had "thrown her under the bus" by informing her supervisor that

she had failed to attend a lunch meeting she had scheduled with a client.  (Mangean Dep. Exh.

19).  The court finds no indication of any kind that DSI considered this delay to be suspicious, or

attempted to learn from Ms. Soldevilla why she waited until she perceived "unprofessional"

conduct by Plaintiff to report his comment.  Meanwhile, Melissa Sites stated she did not recall

the comment during her interview with investigators.  The only other person present when

Plaintiff made the comment was Ross Williams, who was never interviewed.

As to the allegations by Christy Mascolo-Brown, none of the events reported by Ms.

Brown were corroborated during DSI's investigation.  Amy Holmes told the investigators that

Plaintiff's working relationship with Ms. Brown had "turned sour" after he confronted her about

her job performance.  Plaintiff, meanwhile, denied most of the accusations by Ms. Brown, and

testified that he was not given an opportunity to supply the investigators with proof that could

demonstrate that he was innocent of the allegations.  He does not identify any documents that he

believes would establish his innocence.  Instead, he argues that Chad West, who supposedly

witnessed at least one inappropriate comment by Plaintiff to Ms. Brown, was never interviewed,

nor was Leigh Little, although she was no longer employed by DSI at the time of the

investigation.  Other misconduct reported by Ms. Brown, such as the "vibrator" comment to

Louise Hester, was supposedly witnessed by other employees, none of whom were interviewed.

However, it appears that DSI had reason to question the veracity of Ms. Brown's report, based on

Amy Holmes' statement that she was unsure whether to believe Ms. Brown's allegations, and

Rick Leventry's statement that Ms. Brown was "trouble." Nevertheless, DSI appears to have made little effort, if any, to verify Ms. Brown's claims before terminating Plaintiff.

Finally, with regard to Plaintiff's decision to hire Ross Williams, Plaintiff presents an email by Mr. Williams which tends to establish that Catherine Newman did, in fact, interview Mr. Williams with Plaintiff. The email, addressed to Catherine Newman and Plaintiff, is dated Tuesday, November 20, 2007[7], and states as follows:

> Phillip and Catharine,
>
> I just wanted to take a moment to thank you both very much for taking the time to meet with me yesterday, I actually enjoyed the interview, which might be a first for me. I look forward to the opportunity to work with both of you in the future and am eager to hear from you to schedule a date to meet with your Regional Director and continue this process.
>
> Thank you both,
> Ross Williams

(Pl. Dep. Exh. 2). Ms. Newman testified, but did not tell the investigators, that it was possible she had interviewed Mr. Williams, but does not recall doing so because she conducts interviews on a regular basis. (Newman Dep. at 50-51). In short, the court finds numerous grounds to question the veracity of several witnesses who were interviewed and whose statements formed the basis for Plaintiff's termination.

Finally, Plaintiff offers evidence that at least two of the four women who conducted the investigation, Ms. Colvin and Ms. Nelson, harbored a discriminatory animus toward men, and planned to hire more women into leadership positions at DSI. DSI makes no effort to dispute this evidence, or explain why it should be disregarded as circumstantial evidence of their intent

---

[7] Mr. Williams began working for DSI in December 2007. (Pl. Dep. at 41).

to change the demographics of DSI's workforce, starting with Plaintiff's termination.

The court is mindful that the standard in this circuit prohibits it from "quarreling with the wisdom" of an employer's personnel decision. *See Chapman v. AI Transport*, 229 F. 3d 1012, 1030 (11th Cir. 2000); citing *Elrod v. Sears, Roebuck & Co.*, 939 F. 2d 1466, 1470 (11th Cir. 1991) (courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."); *Hawkins v. Ceco Corp.*, 883 F. 2d 977, 980 n. 2 (11th Cir. 1989), *cert. den'd.*, 495 U.S. 935, 110 S. Ct. 2180, 109 L. Ed. 2d 508 (1990) (That the employee did not engage in misconduct reported to the employer is irrelevant to whether the employer believed the employee had done wrong.). Nevertheless, the court cannot evaluate the sufficiency of the evidence as to pretext, or consider whether DSI's proffered reason was a pretext for discrimination, without assessing the credibility of witnesses whose testimony forms the basis, according to DSI, for its decision to terminate Plaintiff. Similarly, DSI offers no evidence to aid the court in determining whether Ms. Colvin, Ms. Nelson, Ms. Barbieri, and Ms. McSherry, Brian Hauser, and Jon Kleu actually believed the allegations against Plaintiff, or whether they understood those allegations to be false but used them, or allowed them to be used, as a pretext for terminating Plaintiff based on his gender.[8]

At this juncture, the court is not empowered to engage in credibility determinations. *See*

---

[8] Jon Kleu was, at the time of Plaintiff's termination, the National Director of Sales for DSI. (Mangean Dep. at 39). He approved the investigators' recommendation that Plaintiff be terminated, but did not participate in the investigation. (*Id*. at 39-41). DSI's corporate witness, Craig Mangean, testified that Mr. Kleu relied solely on the investigators' recommendation in deciding to terminate Plaintiff. (*Id*. at 40-41).

*Lane v. Celotex Corp.*, 782 F. 2d 1526, 1530, 1532 (11th Cir. 1986) ("a question of credibility ...

requires jury resolution"); *Allen-Sherrod v. Henry County School Dist*., 248 Fed. Appx. 145, 148,

2007 WL 2709940, * 2 (11th Cir. 2007) ("It is a hornbook principle that it is not proper for a

district court to assess witness credibility when consideration a motion for summary judgment as

such determinations are reserved for the jury), citing *Avocent Huntsville Corp. v. ClearCube*

*Technology, Inc.*, 443 F. Supp. 2d 1284, 1325 (N.D. Ala 2006); *Wanlass v. Fedders Corp*., 145

F. 3d 1461, 1463 (Fed. Cir. 1998) ("[i]n determining the propriety of summary judgment,

credibility determinations may not be made"); *Amsted Industries, Inc. v. Buckeye Steel Castings*

*Co*., 24 F. 3d 178, 183 (Fed. Cir. 1994) ("[i]n is within the province of the jury to determine the

credibility of a witness and the weight to be given his testimony").  Based on this authority, the

questions whether Ms. Soldevilla, Ms. Newman, Ms. Holmes, Ms. Brown, Mr. Leventry, and

Ms. Sites are credible witnesses as to Plaintiff's harassing behavior, and whether the

investigators and decisionmakers believed those allegations, are properly left to a jury.

Premised on the foregoing, the court cannot agree with DSI that Plaintiff has failed to

adduce evidence of pretext in this case.  Having found enough evidence to satisfy the

*McDonnell-Douglas* analytical framework, the court finds that a "reasonable jury [could]

conclude that discrimination was 'a motivating factor'" for Plaintiff's termination, "even though

[DSI's] legitimate reason may also be true or have played some role in the decision."  *See*

*McDonnell Douglas Corp*, 411 U.S. at 802-05, 93 S. Ct. at 1824-27; *Burdine*, 450 U.S. at 252-

54, 101 S. Ct. at 1093-95; *Desert Palace*, 539 U.S. at 101-02, 123 S. Ct. at 2155-56.  DSI has not

carried its burden of demonstrating, as a matter of law, that it is entitled to summary judgment on

the record before the court.

**B.      Motion to Strike**

Also before the court is DSI's Motion to Strike portions of Plaintiff's evidentiary submission.  (Doc. 34).  In it, DSI moves the court to strike two exhibits filed by Plaintiff, including documents entitled "Exhibit C – Fryman 360 Feedback Form," and "Exhibit D – Natasha Nelson's Linked In Resume."  (See doc. 32, Exhs. C & D).  In his response, Plaintiff does not oppose the motion as it relates to Exhibit D, and to the extent the motion seeks that relief, it is due to be granted.

As to Exhibit C, the document appears to be feedback on the performance of Michael Fryman, a district manager for DSI who in 2007 worked in a different district from Plaintiff.  The feedback has apparently been reported by members of Mr. Fryman's team, which exhibits excellent ratings from his sales representatives.

Plaintiff filed Exhibit C as a reference point for comparing his own 360 Feedback Form. Plaintiff's purpose in filing this document is to demonstrate that certain feedback categories included in Mr. Fryman's feedback form are not included in Plaintiff's.  It is not clear to what end Plaintiff makes this argument, or how it is relevant to his claims.  Specifically, Mr. Fryman's feedback form contains sections for his team members to comment on Mr. Fryman's performance in the following areas: "Works in the spirit and policy of EEO and affirmative action," "Interacts with staff frequently," and "Provides regular and constructive performance and developmental feedback."  Plaintiff's feedback form from his sales representatives contains no reference to these fields.

DSI moves to strike Exhibit C on several grounds, including that its authenticity cannot be confirmed, and it is irrelevant because it played no part in the decision to terminate Plaintiff.

29

According to DSI, Mr. Fryman did not participate in the decision to terminate Plaintiff and has not been identified as a comparator to support Plaintiff's discrimination claim.  DSI argues further that only the last two pages of the eleven-page document resemble forms used by the company in conducting 360 evaluations.  Accordingly, the first nine pages of the exhibit may have been cut-and-pasted from another, unidentified document.  Finally, DSI posits that the date of Mr. Fryman's feedback form, April 28, 2008, cannot be authenticated, as the facsimile information at the top of the form is dated December 11, 2006, for feedback comments relating to Mr. Fryman's job performance in 2007.

The court's review of Plaintiff's feedback forms (see doc. 32, Exh. A) confirms that the above categories for review are not included though they are contained in the feedback forms for Mr. Fryman.  However, the relevance of Exhibit C is doubtful, as Plaintiff's team members did not make the decision to terminate him, and it is unclear to the court how their perspective of his performance in these areas is relevant to whether DSI terminated him because of his gender.

The court's review of Plaintiff's feedback forms compared with Mr. Fryman's reveals that they are identical, with the exception of the three missing categories indicated by Plaintiff.  However, the date at the top of the feedback form, December 11, 2006, compared with the date of the actual computer-generated feedback contained on the form, April 28, 2008, renders suspicious the authenticity of the entire exhibit.  Plaintiff offers no meaningful rebuttal to this point.[9]  Additionally, Plaintiff relies on Mr. Fryman's feedback report to indicate that Mr.

---

[9]  The court notes that Plaintiff's feedback form (Exhibit A) is dated March 10, 2010, nearly two years after Plaintiff was terminated.  No argument is made by either party as to the authenticity of this date or the feedback contained on the form.  If this date is incorrect, it is reasonable to assume the date on Mr. Fryman's form, April 28, 2008, is similarly inaccurate and should not form the basis for striking the same.  However, Exhibit C contains three dates, none of which appears more accurate than the others.  The court, having no basis upon which to determine the

(continued...)

Fryman's team members had the opportunity to comment on each field of his performance.  (See Exhibit C, pp. 1-9).  Plaintiff maintains that "[n]one of the comments sections for Mr. Lamb's 2007 360 feedback report from direct reports have been produced."  (Pl. Opp. Br. (doc. 31) ¶ 52). However, while the feedback forms for Mr. Fryman and Plaintiff do not follow the same format, Plaintiff's feedback forms contain six pages of comments by each member of his team as to each category of inquiry.  (See Exhibit A pp. 2-7).  Thus, it is not clear to the court what point Plaintiff is attempting to make by submitting Mr. Fryman's feedback forms completed by the sales representatives who reported to him.

Given the doubts as to the authenticity of Exhibit C to Plaintiff's opposition to summary judgment, and its apparent lack of relevance to Plaintiff's discrimination claim, the court concludes that DSI's Motion to Strike the same is due to be granted.

## V.    CONCLUSION

Having found genuine issues of material fact, and that DSI is not entitled to summary judgment as a matter of law, the court concludes that DSI's Motion for Summary Judgment (doc. 12) is due to be denied.  The Motion to Strike (doc. 34) is due to be granted.  A separate Order will be entered contemporaneously herewith.

---

[9](...continued)

accurate date of the form, cannot conclude that Exhibit C is an authentic documentation of feedback for Mr. Fryman for his performance in 2007.  Therefore, the court sees no grounds to compare it with Plaintiff's feedback form for 2007.

To the extent Plaintiff argues that the court should deny the Motion to Strike because DSI has failed to submit to the court the original feedback form for Mr. Fryman which, according to Plaintiff, should resolve the dispute about the document's authenticity, the court disagrees.  DSI has presented a sufficient basis, grounded in the inconsistent dating of the document, to establish that Exhibit C is not a reliable source of evidence for what categories should have been included in Plaintiff's feedback form in 2007.

**DONE**, this 29th day of November, 2010.

**JOHN E. OTT**
United States Magistrate Judge